## UNITED STATES *v.* RICHMOND MIN. CO.

*(Circuit Court, D. Nevada.* November 23, 1880.

**PUBLIC LANDS—RIGHT TO TIMBER CUT FOR MINING PURPOSES.**
    The defendant, a corporation engaged in mining, reducing ores, and refining bullion, purchased wood and charcoal for use at its reduction works. The cord-wood, and the wood from which the charcoal was manufactured, were cut upon unsurveyed, public lands, mineral in character, of little or no value except for the mineral therein, and within organized mining districts, or not far remote from known mines. *Held,* that this was mineral land within the meaning of the act of congress

of June 3, 1878, permitting timber to be taken therefrom for "building, agricultural, mining, or other domestic purposes;" and that defendant could lawfully purchase such wood and coal for said use under the license given by said act.

*(Syllabus by the Court.)*

At Law. Replevin.

*J. W. Whitcher,* U. S. Atty., and *Henry Rivers,* for plaintiff.

*Wren & Cheney,* for defendant.

SABIN, J. This is an action of replevin, brought by plaintiff to recover from the defendant the possession of 10,000 bushels of charcoal, of the alleged value of $1,800, and 300 cords of wood, of the alleged value of $2,100, the same being at the yard and premises of the defendant at the town of Eureka, in this state. The complaint alleges that said coal was manufactured from wood cut and removed from the unsurveyed public timber lands of plaintiff within said state, and that said 300 cords of wood were cut and removed from said lands, and all so cut and removed unlawfully and without the consent of plaintiff, and that plain-. tiff is now the owner thereof. Plaintiff demands judgment for the recovery of the possession of said coal and wood, or for the value thereof, in the sum of $3,900, if recovery of possession cannot be had. The answer of defendant denies that plaintiff is the owner of said personal property; denies that said wood was cut from the lands mentioned in the complaint; denies that defendant wrongfully or unlawfully or without plaintiff's consent took possession of said property, or wrongfully or unlawfully withholds possession of the same, or any part thereof, from plaintiff. The case was tried before the court, without a jury. The findings of fact upon the evidence submitted are brief, and as follows:

"(1) That the defendant, the Richmond Mining Company of Nevada, is a corporation duly organized and existing under and by virtue of the laws of the state of Nevada, engaged in the business of mining, purchasing, and reducing ores, and separating gold and silver from lead, in the town and county of Eureka, state aforesaid, and was such corporation and so engaged at the time of, and long prior to, the commencement of this action. (2) That at the time of the commencement of this action said defendant was in possession of 16 cords of wood, of the value of six dollars per cord, and seven thousand bushels of charcoal, of the value of 21 cents per bushel, at its works in said town; and that said wood, and the wood from which said charcoal was manufactured, was cut upon the unsurveyed mineral lands of the United States, not subject to entry under any existing law of the United States except for mineral entry; and that said wood was cut, and said charcoal was burned, by *bona fide* residents of the said state, for use in the said county, and sold to said defendant for use in carrying on its said business in said town, at a distance of about three miles from its mines. (3) That the trees from which said wood was cut were a species of scrubby nut pine, cedar, and what is locally called 'Mountain Mahogany,' about ten or twelve feet in height on an average, with bodies from four to eight feet in length, and less than twelve inches in diameter, and unfit for manufacture into either lumber or timber."

I believe the correctness of these findings is not questioned by either party.

The defendant justifies its purchase and possession of said coal and wood under the provisions of an act of congress, approved June 3, 1878,

(20 U. S. St. p. 88, c. 150.) The section of said act under consideration reads as follows:

: "That all citizens of the United States, and other persons, *bona fide* residents of the state of Colorado or Nevada, or either of the territories of New Mexico, Arizona, Utah, Wyoming, Dakota, Idaho, or Montana, and all other mineral districts of the United States, shall be, and are hereby, authorized and permitted to fell and remove, for building, agricultural, mining, or other domestic purposes, any timber or other trees growing or being on the public lands, said lands being mineral, and not subject to entry under existing laws of the United States except for mineral entry, in either of said states, territories, or districts of which such citizens or persons may be at the time *bona .fide* residents, subject to such rules and regulations as the secretary of the interior may prescribe for the protection of the timber and of the undergrowth growing upon such lands, and for other purposes: provided, the provisions of this act shall not extend to railroad corporations."

From the findings of fact as above set forth it would seem that defendant's justification of the purchase and possession of this coal and wood is complete. It was shown in evidence, and admitted, that the land upon which all of this wood was cut and removed was and is unsurveyed public land of plaintiff. A large number of witnesses was examined as to the character of this land, whether mineral or not, and whether more valuable for the timber or wood thereon than for known mines. The witnesses differed in their judgment as to the character of this land, or at least as to the particular, limited part thereof, the *locus in quo*, from which this wood had been removed. On this point, the most of the witnesses for plaintiff were teamsters, or men engaged in cutting, hauling, or furnishing wood or coal to those desiring to purchase it. Their evidence, generally, was to the effect that upon the particular tracts of land upon the hills or mountains, whence this wood had been removed, they had never seen any well-known mines, nor had they observed marked or well-defined traces of mineral-bearing ledges. By their own evidence it appeared that they were not looking for mines or ledges, not interested especially in them, and their observation was only the most cursory. They were in no wise skilled in discovering or noting mineral signs and traces, and it would have been purely accidental had any of them, in walking over or along a rich ledge, discovered its existence, or discerned that it might be valuable. I do not question the integrity or truthfulness of any of these witnesses. I doubt not they were honest, and testified to matters as they saw them,—or, rather, did not see them. The value of negative evidence is often slight. It is often unsatisfactory, unless it be shown that the witness possessed thorough knowledge of the subject; that he had ample field for observation and that his attention was closely called to the matter under discussion. None of these conditions obtain as to these witnesses. On the part of the defense it was shown that this wood was cut, if not wholly within the limits of an organized "mining district," yet certainly adjacent thereto, and much of it not far from known and recognized mines, and all within what is commonly known and recognized as a mineral region,—a tract of country where mines have been found, and may be sought for with reasonable hope of

success. It was shown that, beginning at or near the town of Palisade, in this state, a range of mountains extends in a southerly direction for at least 150 miles; that this range bears mineral nearly its whole length; that it has been prospected over for the past 20 years, and is being constantly prospected for mines, and that new discoveries are being made; that between Palisade and the town of Eureka, a distance of about 90 miles, 8 or 10 or more mining districts have been organized, in all of which mines of value have been found; that many of these mining districts are contiguous, and cover nearly all of the distance between the two towns named; that these mining districts extend south from Eureka for a distance of from 60 to 70 miles, in many of which rich mines have been found. The United States topographical surveys confirm this evidence. This mountain range is intersected in some places by low passes and valleys, and different parts of it have local names, but it virtually constitutes a continuous range, though broken in places, on which mines of great value have been found, and doubtless others remain to be found. It is one of the richest mining belts or zones in the state. The Eureka mining district alone is reported to have produced between eighty and ninety millions of dollars since its discovery, and large mining operations are still going on there. Upon this mountain range, and upon the foothills adjacent thereto, is found the timber or trees of the character and quality mentioned in the findings of fact above set forth. It was upon this mountain range and upon the foot-hills adjacent that the wood in controversy was cut, and much of it within the limits of organized mining districts, and not far remote from known mines. It can hardly be questioned or doubted that the land upon which this wood was cut is properly classified and recognized as mineral land, and strictly within the purview of the act of congress above cited. This land has no value except for its minerals. It is mountainous, or broken foot-hills, with no soil, and not capable of cultivation. The wood growing thereon is fit only for domestic use; it has no value as timber to be made into lumber. It is the discovery and opening and working of mines that creates a demand for this timber or wood. · The test of the land department as to whether a timber or mineral entry should be allowed, to-wit, "Which is the land most valuable for, its timber or known mines?" does not apply in cases like the one before us. The test is very proper in the cases where it is used, as applied to a limited tract of land; but as applied to a large tract of land extending, as this mineral range does, for hundreds of miles, it has no application, for the land has no value for its wood, or anything else, until the discovery and opening of mines creates a market, and gives a value to the wood. During the 25 years that Nevada has been a state none of this land has been surveyed, except in isolated places in the valleys. It will not be contended that the benefits of the statute are limited to the use of the wood or timber growing upon known mining claims. Such a construction would wholly defeat the object and purpose of the statute, since such timber or wood belongs to the owner of the claim.

It is urged with some earnestness that, as it is shown this wood and coal were to be used in the reduction of ores and refining the product

thereof, such a use is not a mining use properly; that reducing ores by mill or furnace process, and refining the bullion, is not a part of mining. If not properly a part of mining, it certainly is incident to it, and closely connected with it. In a very restricted sense it may be true that mining is limited to the breaking down or digging up of ore in place. In its ordinary and usual sense mining embraces many things connected therewith, and it calls to its aid the services of many classes of persons not at all skilled in, or wholly ignorant of, the manual labor of mining. But not to dwell upon this point, we may concede that reducing ores and refining the product may not be strictly mining. Still this business by itself is a domestic industry of the highest importance to the miner and to the public. Without reduction works it would profit the miner or the public but little to mine the ore. Reducing ores is certainly a lawful pursuit or business, and those engaged in it within the state are within the benefits conferred by the statute, and entitled to use this wood or timber for this purpose. The miner is not the only person benefited by the statute. It applies to all alike who use this wood or timber for domestic or local use within the state. And it matters not whether such reduction works, mills, or furnaces are engaged in reducing ores from mines owned by the proprietors of the works, or are engaged in reducing purchased ores, or in what is usually called "custom work," for pay, toll, or tribute from the owner of the ores reduced. All industries within the state, not prohibited from such use, are within the protection of the statute. I have, therefore, no doubt, under the evidence in this case, but that the defendant had full right to purchase this coal and wood, and use the same at its reduction works, and that the statute above cited is a complete defense to this action. It follows, therefore, that judgment must be entered for the defendant, and it is so ordered.